UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| MARTIN COUNTY COAL CORPORATION, | ) ) ) | |
| | ) | Civil Action No. 08-93-ART |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| | ) | **MEMORANDUM OPINION &** |
| UNIVERSAL UNDERWRITERS INSURANCE SERVICES, INC., | ) ) ) | **ORDER** |
| Defendant. | ) ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

After breaching its duty to defend its insured in a lawsuit that ultimately settled, Universal Underwriters now hopes to avoid paying for the settlement because its insured was not "actually liable" in the underlying suit. Even assuming this is a basis for avoiding payment, however, Universal has not yet disproved its insured's actual liability. The defendant's motion for summary judgment is denied.

### BACKGROUND

On January 19, 2001, Crum Motor Sales—hired by Martin County Coal to service vehicles on its mine site—sent Phillip Crum to do some repair work. R. 96, Attach. 6 at 2-3. A MCC employee gave him a ride across the site to retrieve a vehicle. *Id.* at 3. Tragically, as they drove through an area of active mining, a boulder fell and seriously injured Phillip Crum. *Id.*

Phillip Crum and CMS sued MCC to recover for his injuries. But MCC cross-claimed against CMS, arguing that the original MCC-CMS service agreement entitled MCC to

indemnification for Crum's injuries. Indeed, CMS had contracted to indemnify MCC "against any and all liabilities, demands, losses, claims, and damages of any kind, whether on account of injury to or death of any person or persons including, but not limited to, agents, employees, representatives, vendors, invitees, subcontractors of [CMS] or of Martin County." R. 16, Attach. 4 at 2. In turn, CMS asked its insurer, Universal Underwriters, to defend against the indemnity claim. But Universal refused.

MCC and Phillip Crum then settled for $3.65 million, and CMS settled with MCC for the same amount, plus attorney's fees and costs. R. 16, Attach. 14 at 4. In exchange for MCC's promise not to enforce the settlement against it, CMS handed over its claim to MCC against Universal for breach of its duty to defend. MCC, standing in CMS's shoes, filed suit against Universal, and this Court previously held that Universal breached its duty to defend CMS and thus owes damages—including the settlement amount, if reasonable. Universal now asks this Court to decide, on summary judgment, that the settlement was not reasonable.

## DISCUSSION

According to the Sixth Circuit's view of Kentucky law—which is binding on this Court, *Rutherford v. Columbia Gas*, 575 F.3d 616, 620 (6th Cir. 2009) (Clay, J., concurring in part and dissenting in part)—an insured seeking post-settlement indemnity from an insurer who breached its duty to defend must show that the insured "could have been held liable in the [underlying] litigation for a covered claim if there had not been a settlement." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 270 (6th Cir. 2010). It is not clear what the Sixth Circuit meant by "*could* have been held liable." The court relied on the decision in *Kentucky*

*School Boards Insurance Trust v. State Farm Mutual Insurance*, 907 F. Supp. 1036, 1038 (E.D. Ky. 1995) for support, which held that the insured must show that it was *actually* liable—that is, it must "try the antecedent case *de novo*." *Id.* at 1037-38. But it is unclear this is right. Not only does the Ninth Circuit insist "[n]o court" requires such a showing, *Fireman's Fund Ins. Co. v. Sec. Nat. Ins. Co.*, 44 F. App'x 161, 162-63 (9th Cir. 2002), *see also Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1091 (2d Cir. 1986), but the *Kentucky School Board* decision itself relied upon *Barnes v. Pennsylvania Casualty Co.*—which merely held that the terms of a particular insurance contract required a showing of actual liability. 208 S.W.2d 314, 315 (Ky. 1948). Furthermore, many of the cases Universal relies upon to support an "*actual* liability" standard are about common law indemnity, rather than an insurance contract dispute. And there is little question Universal would be barred from contesting CMS's actual liability if the case had ended in a verdict rather than a settlement. *State Farm Mut. Auto. Ins. Co. v. Shelton*, 368 S.W.2d 734, 737 (Ky. 1963); *see also Metro. Cas. Ins. Co. of N.Y. v. Albritton*, 282 S.W. 187, 189 (Ky. 1926). But maybe the Sixth Circuit actually meant that an insured must show only that it reasonably "could," rather than "would," have been held liable. Some jurisdictions do require such a showing. *See Guillen ex rel Guillen v. Potomac Ins. Co.*, 751 N.E.2d 104, 118 (Ill. App. Ct. 2001). Ultimately, however, it does not matter at this stage which is true. Universal has not dispelled the possibility, beyond any genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), that CMS either "would" or "could" have been liable to MCC.

Universal argues first that CMS was not liable because the MCC-CMS indemnity

agreement ran afoul of Kentucky's rule that a party cannot exculpate itself from "liability for damages caused by [its] failure to comply with a duty imposed by a safety statute." *Hargis v. Baize*, 168 S.W.3d 36, 47 (Ky. 2005). The safety statute, Universal says, is 30 C.F.R. § 77.1001—which imposed a duty upon MCC to "strip[]" "[l]oose hazardous material . . . for a safe distance from the top of pit or highwall" and otherwise secure "loose unconsolidated material."

The problem for Universal is that while MCC's exculpatory agreement may be invalid insofar as it sought to exculpate MCC for failing in its duty to clear loose material, the agreement could still validly exculpate MCC for violations of *other* duties. After all, the simple fact that a party is subject to a particular duty under one safety statute does not mean the party can never exculpate itself for breaches of any other duties. In *Greenwich Ins. Co. v. Louisville & N.R. Co.*, 66 S.W. 411, 412 (Ky. 1902), for instance, the court upheld a contract exculpating a railroad for damage to the plaintiff's property even though the state constitution forbade the railroad from contracting around its "common law" duties. It explained that the common law duties mentioned in the constitution were those that ran to passengers and employees, not the duty at issue in that case. *Id.* at 412-13. Here, Phillip Crum sued MCC for breach of duties beyond the obligation to clear and secure loose material. On top of the claim that MCC breached its duty under 30 C.F.R. § 77.1001, Phillip Crum asserted four other causes of action. R. 96, Attach. 6. Even assuming that his negligence and gross negligence claims essentially alleged breaches of the same duty imposed by § 77.1001, Count V alleged that MCC failed in its duty to operate Phillip Crum's vehicle with reasonable care, and Count II alleged that MCC failed in its duty to

adequately inspect its property. *Id.* Universal has neither explained how these counts implicate the duty imposed by § 77.1001 or otherwise argued that these claims lacked merit. Hence, MCC presumably still could have sought indemnity for the cost of covering those two claims.

Universal also argues that a general public policy favoring safe coal mining, otherwise a very dangerous undertaking, forbade MCC from collecting an indemnity for an injury sustained on its mine site. R. 96, Attach. 2 at 27. Yet MCC cites no cases directly on point for the broad claim that a party engaged in dangerous activity can never enter any indemnity agreement relating to that activity. The cases it relies upon say only that an employer is (notably) *not* liable for the torts of employees of independent contractors engaged in inherently dangerous activity, *King v. Shelby Rural Elec. Co-op Corp.*, 502 S.W.2d 659, 662 (Ky. 1973); that a landowner cannot insulate himself from liability flowing from blasting by having an independent contractor perform the task, *Kentucky Stone Co. v. Gaddie*, 396 S.W.2d 337, 340 (Ky. 1965); and that a landowner cannot escape liability for property damage caused by his lessee's mining operation, *Green v. Asher Coal Mining Co.*, 377 S.W.2d 68, 70 (Ky. 1964). What's more, the view that those engaged in a coal mining enterprise cannot exculpate themselves for virtually anything cannot be squared with the holding in *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644 (Ky. 2007). There, the court upheld an exculpatory agreement in favor of Bell County Coal after flooding caused by Bell's faulty mine mapping damaged equipment belonging to the plaintiff. *Id.* at 646. It rejected the argument that public policy invalidated the agreement—even in the face of an applicable safety statute. *Id.* at 651-52. The court explained that the two parties entered the exculpatory agreement at arm's length and upon equal footing,

and Kentucky law "[r]ecogniz[es] the importance of freedom to contract." *Id.* at 650.

The knockout punch in Universal's quest to invalidate the CMS-MCC agreement on public policy grounds is that it has failed to definitively establish that there was a disparity in bargaining power between MCC and CMS. In *Cumberland Valley Contractors*, 238 S.W.3d at 651, the Kentucky Supreme Court held that the key factor in determining whether public policy invalidates an exculpatory agreement—even, apparently, when the agreement runs afoul of a public safety statute—is whether there is a "significant disparity in bargaining power" between the parties. Here, Universal insists that MCC enjoyed a significant advantage in bargaining power because MCC was a much more profitable business, and the terms of the MCC-CMS agreement were non-negotiable. R. 96, Attach. 2 at 30-31. But, unless MCC was a monopoly, a disparity in the parties' economic position is not necessarily a problem—especially if, as Universal has failed to dispute here, the "poorer" party was free to take his business elsewhere. *See Smith v. Pheonix Invs., LLC*, No. 2007-002023, 2008 WL 3551178, at *3 (Ky. Ct. App. Aug. 15, 2008) (holding that a single customer of a storage facility did not suffer from a disadvantage of bargaining power because the customer was free to transact with a competitor); *see also Xerox v. Ditigal Express Graphic*, No. 2006-02339, 2008 WL 2278492, at *5 (Tenn. Ct. App. May 22, 2008) (court was "unpersuaded" that a small business "did not possess the same bargaining power as Xerox").

Universal's disparity claim is particularly difficult to swallow when both parties to the contract were businesses and Universal has said nothing about CMS's relative sophistication. *See, e.g., Cumberland Valley Contractors*, 238 S.W.3d at 654 (holding that parties enjoyed

"equal bargaining power" while noting both were "business corporations"); *see also Buck Run Baptist Church, Inc. v. Cumberland Sur. Ins. Co.*, 983 S.W.2d 501, 504 (Ky. 1998) (holding that disparity was unlikely where parties were "relatively sophisticated commercial entities and a surety company" or otherwise between "sophisticated and knowledgeable businessmen"); *Fite & Warmath Const. Co., v. MYS Corp.*, 559 S.W.2d 729, 735 (Ky. 1977) (holding that agreement "voluntarily entered into by sophisticated and knowledgeable businessmen" did not suffer from a disparity in bargaining power). Without at least showing that there was a disparity in bargaining power between CMS and MCC, Universal's hopes of invalidating their indemnity agreement are dashed.

Undeterred, Universal next asks this Court to take a leap down the rabbit hole. CMS, the defendant alternatively argues, was not "actually liable" to MCC because MCC was not "actually liable" to Phillip Crum in the first place. R. 96, Attach. 2 at 19. An "exclusive-remedy provision" of Kentucky's Workers' Compensation Act, the argument goes, barred Phillip Crum's claims against MCC, and the trial court was wrong to hold otherwise. *Id.* at 20-24; R. 120 at 10-11. In other words, CMS would not have even needed to show up to litigate its own liability had Phillip Crum, MCC, and the trial court not first botched the resolution of the first claim. *See, e.g.,* R. 96, Attach. 2 at 10 ("Therefore, had Martin County Coal appealed after a final judgment, it would have won, and we wouldn't be litigating this case."). Yet Universal cites not one authority for the proposition that an insured—the only capacity in which MCC is suing in this case, R. 1, Attach. 2 ¶ 12—must not only demonstrate its own actual liability, but must also re-litigate predicate claims alleging *another* party's actual liability if it set off a chain of events

ultimately leading to the insured's liability. Universal might have cited *Ashland Oil & Refining Co. v. General Tel. Co.*, 462 S.W.2d 190 (Ky. 1970), where the court held the plaintiff could not recover an indemnity because its opponent in the underlying suit was contributorily negligent and would have lost at trial. *Id.* at 192, 193-94. But there, unlike here, the court did not ask the putative indemnitee to prove the actual liability of another litigant for a claim separate from the one for which the indemnitee was itself liable. The Court is aware of no authority extending the "actual liability" rule so far.

But Universal might be groping at a slightly different point. Just as it says CMS could have escaped liability before the trial court by showing that a public safety statute invalidated the CMS-MCC agreement, Universal might also mean to say that CMS could have avoided indemnifying MCC by showing that MCC was not "actually liable" in view of the worker's compensation statute. This is a subtly different and interesting argument, but Universal has not developed it. Only a couple of sentences hint that this is what Universal had in mind. *See* R. 96, Attach. 2 at 24 ("And because Martin County Coal wasn't legally liable to Crum, Crum Motors Sales isn't legally liable to indemnify Martin County Coal against what it paid Crum."); R. 120 at 11 ("MCCC couldn't have been legally compelled to pay Crum. Consequently, CMS couldn't have been legally compelled to indemnify MCCC against its settlement with Crum."). Yet this issue bristles with complexity. Does CMS's liability to MCC turn on the broad language of their service-indemnity contract? Or does it depend on the "actual liability" rule customary in common law indemnity cases? Was this defense available to CMS at the trial court proceeding (or does it matter)? Can the Court now revisit the trial court's factual determination that Phillip

Crum did not perform "regular and recurrent" work for MCC? Or do the preclusion doctrines apply? None of these issues has been addressed. MCC, which barely touched the worker's compensation issue, was not on notice that these issues lurked in Universal's motion. The Court will therefore not consider the argument at this juncture, as "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *Smoot v. United Transp. Union*, 246 F.3d 633, 647 (6th Cir. 2001) ("This court deems issues presented in a perfunctory manner on appeal to have been waived.").

Finally, both MCC and Universal ask this Court to grant summary judgment on the question whether the $3.65 million settlement between CMS and MCC was the product of fraud or collusion. *See* R. 99 at 3. But the record is simply too inconclusive to declare that there are no genuine disputes of material fact concerning the possibility of collusion between CMS and MCC. On the one hand, MCCC apparently informed Universal about the purportedly collusive mediation and invited Universal to attend. R. 110, Attach. 1 at 2. And during negotiations between Phillip Crum and MCC, evidence indicates that MCC sought to minimize the amount it would pay the plaintiff rather than simply accept his initial seven-figure offer and hope to pass the bill to Universal. *Id.* at 2, 7. But once it came time for MCC and CMS to negotiate their own settlement, it is unclear how the mediation proceeded. Did CMS simply roll over, rather than assert the strength of its defenses, with the understanding that MCC would only try to recover the $3.65 million from Universal? Because too much remains unclear and in genuine dispute, the Court cannot enter summary judgment on this issue either.

CONCLUSION

For these reasons, it is **ORDERED**:

(1)   Universal's motion for summary judgment, R. 96, is **DENIED.**

(2)   Martin County Coal's motion for summary judgment, R. 110, is **DENIED** to the extent it is a motion**.**

This the 12th day of November, 2010.

Signed By:
*Amul R. Thapar* AT
United States District Judge