UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| MARTIN COUNTY COAL CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 08-93-ART |
| v. | ) ) ) | **MEMORANDUM OPINION & ORDER** |
| UNIVERSAL UNDERWRITERS INSURANCE SERVICES, INC., | ) ) ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The standard for securing summary judgment is appropriately a tough one, and courts should be hesitant to deprive litigants of their day in court. (Hence, this Court has already denied two such motions in this case.) But courts should not force parties who have thoroughly shown that they cannot lose at trial to still suffer the expense of actually going to trial. Universal has made that showing. It has compellingly demonstrated, with citations to case law and the record, that it can avoid paying for its insured's settlement with another party because its insured was not *actually* liable to the other party—a requirement of the insurance policy. With Universal having met its burden, the ball was in Martin County Coal's court. Martin County failed to meaningfully support its arguments with record evidence. Universal's motion for summary judgment is granted.

## BACKGROUND

A subsidiary of Massey Coal Company, R. 105, Attach. 1 at 4, Martin County Coal is a big business in its own right. Its sees many millions of dollars in revenue each year. R. 46,

Attach. 19. And it employs outside vendors to help with its mining work. *See* R. 105, Attach. 1 at 6. This case is about one of them.

On July 7, 1997, Martin County Coal hired a much smaller company of between five and nine employees, Crum Motor Services ("CMS"), to repair vehicles on Martin County Coal's mine site. *Id.* at 7. As part of the deal, Martin County Coal "required" CMS to sign a non-negotiable, "standard" indemnity agreement. R. 105, Attach. 1 at 6, 10, 11; R. 163, Attach. 17 at 2. In that agreement, CMS broadly promised to indemnify Martin County Coal for "all liabilities, demands, losses, claims, and damages of any kind" asserted in connection with CMS's repair work on the premises. R. 163, Attach. 2 at 1. On top of that, CMS agreed to pay Martin County Coal's attorney's fees, to secure proof of insurance, and to grant Martin County Coal authority to revoke permission to access Martin County Coal's property "at any time." *Id.* at 1-2.

Several years later, on January 19, 2001, CMS sent Phillip Crum to do some repair work for Martin County Coal. R. 96, Attach. 6 at 2-3. A Martin County Coal employee gave him a ride across the site to retrieve a vehicle. *Id.* at 3. Tragically, as they drove through an area of active mining, a boulder fell and seriously injured Phillip Crum. *Id.* The Mine Safety and Health Administration then issued a citation to Martin County Coal, noting that "loose unconsolidated rock and dirt was present above the roadway leading to the Maynard Fork workings in the area where a serious accident occurred from falling rock." R. 163, Attach. 9.

Phillip Crum and CMS sued Martin County Coal to recover for his injuries. But Martin County Coal counterclaimed against CMS, arguing that their original agreement

2

required CMS to pay for Crum's injuries. Facing that counterclaim, CMS asked its insurer, Universal Underwriters, to defend it. But Universal refused.

The parties settled. First, Martin County Coal agreed to pay Phillip Crum $3.65 million. Then CMS agreed to pay the same amount to Martin County Coal, plus attorney's fees and costs. R. 16, Attach. 14 at 4-5. But in return, Martin County Coal agreed to not actually enforce the settlement against CMS: CMS had a potential claim against its insurance company, Universal, for failing to defend it, and CMS agreed to assign that claim to Martin County Coal.

After Martin County Coal, standing in CMS's shoes, filed suit against Universal, Universal removed to federal court. The first question in this case was whether Universal had a duty to defend CMS in the first place. And this Court previously held that, because CMS's dispute with Martin County Coal "potentially, possibly or might [have] come within the coverage of" Universal's policy, R. 61 at 6 (citing *Ayers v. C & D Gen. Contractors*, 269 F. Supp. 2d. 911, 914 (W.D. Ky. 2003)), Universal indeed had a duty to defend CMS. The Court also held that Universal breached that duty, meaning it is potentially liable for damages—including not just proven defense costs, *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984); *see also James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991) (explaining that insurer that breaches duty to defend could be liable for defense costs even if not ultimately liable for the judgment against the insured), but potentially the $3.65 million settlement amount as well. *See Cincinnati Ins. Co. v. Vance*, 730 S.W.2d 521, 522 (Ky. 1987).

The question now is how much money Universal owes Martin County Coal. Both Universal and Martin County Coal have filed prior motions for summary judgment on this

3

issue. Universal has argued that, even though it breached its duty to defend, it is not liable for CMS's $3.65 million settlement because CMS could not have been held "actually liable" to Martin County Coal if that case had gone to trial. Until today, the Court has denied Universal's motion for summary judgment on that ground. Not only was it unclear whether Universal could avoid payment by disputing CMS's actual liability, this Court explained. But, even if it could, Universal had also supplied too little evidence to show that CMS was not actually liable. This time, however, Universal has made a compelling case, and Martin County Coal has left it unanswered.

## DISCUSSION

### I. Actual Liability

Contrary to Martin County Coal's claim, Universal can avoid paying for CMS's settlement if CMS would not *actually* have been held liable to Martin County Coal at trial. Kentucky courts have held that insurers can avoid paying for their insured's voluntary settlements if the insurance contract limits coverage to cases in which the insured is actually liable. *Barnes v. Penn. Cas. Co.*, 208 S.W.2d 314, 316 (Ky. 1948); *Royal Indem. Co. v. May & Ball*, 300 S.W. 347, 349 (Ky. 1927); *see also Ky. Nat'l Ins. Co. v. Lester*, 998 S.W.2d 499, 504 (Ky. Ct. App. 1999) (holding that car insurance company could contest its obligation to pay insured on the theory that the insured had not shown that other party in car accident was at fault, as required by contract); *cf. Ashland Oil & Ref. Co. v Gen. Tel. Co.*, 462 S.W.2d 190, 193 (Ky. 1970) (holding that common law indemnitor could dispute indemnitee's actual liability for voluntary settlement). And here, Universal's policy does indeed make coverage contingent on CMS's actual liability—saying, much like the contracts in *Royal Indemnity* and *Barnes*, that Universal must "pay all sums the insured *legally must pay as damages*."

4

*See* R. 16, Ex. 2 at 39, 61 (emphasis added); *see also id.* at 75, 77 (defining "loss"); *Royal Indem. Co.*, 300 S.W. at 349 ("are liable for damages"); *Barnes*, 208 S.W.2d at 315 (Ky. 1948) ("liability imposed by law").[1]

Dig a little deeper, and this makes sense: There are only two conceivable bases for holding an insurer like Universal liable for its insured's liabilities at the end of litigation. First, the court's judgment in the insured's case could have issue-preclusive effect against the insurer because the insurer had the right and opportunity to dispute its insured's liability in the first place. *See Metro. Cas. Ins. Co. of New York v. Albritton*, 282 S.W. 187, 187, 189 (Ky. 1926); *see also State Farm Mut. Auto. Ins. Co. v. Shelton*, 368 S.W.2d 734, 737 (Ky. 1963) (holding that "[t]he doctrine under which a person not a party to a suit may be bound by a judgment therein is not strictly res judicata but collateral estoppel"). But where, as here, the case ends in a voluntary settlement or a simple consent judgment, R. 16, Attach. 13, rather than a final judgment on the merits, the outcome typically has no issue-preclusive effect. *Compare Barnes*, 208 S.W.2d at 316 (allowing insurer to contest actual liability where case ends in settlement) *and Burgess v. Consider H. Willett, Inc.*, 225 S.W.2d 315

---

[1] The Court's first opinion in this case might be read as holding that the Universal insurance contract "covered" the CMS-Martin-County-Coal dispute. *Martin County Coal Corp. v. Univ. Underwriters Ins. Servs., Inc.*, No. 08-93, 2010 WL 55926, at *6 (E.D. Ky. Jan. 4, 2010). But "cover" is a slippery term. That opinion should be read to hold only that the allegations against CMS could "possibly" trigger Universal's obligations under the agreement and thus required Universal to defend CMS. *See James Graham Brown Found.*, 814 S.W.2d at 279 (holding insurers have a duty to defend insureds if the insureds' cases could "possibly" be covered by the policy). The Court did not hold that the agreement "covered" the CMS-Martin-County-Coal agreement in the sense that it actually obligated Universal to indemnify CMS for the outcome of the CMS-Martin-County-Coal litigation. *See Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 841 (Ky. 2005) (holding that insurer can breach a duty to defend even if the policy is ultimately determined not to cover the insured's liability). Today, the Court holds that the policy does not actually require Universal to pay an indemnity for the settlement.

(Ky. 1949) (holding that consent judgment was mere agreement between the parties and had no preclusive effect) *with Albritton*, 282 S.W. at 187, 189 (holding that a judgment on the merits was preclusive against insurer) *and Shelton*, 368 S.W.2d at 735, 737 (holding that judgment "obtained against" insured had issue-preclusive effect except on issue whether judgment obtained through fraud); *see also* 18A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 4443 (2d ed. 2010). Second, the insurer could contract to pay for its insured's voluntary settlements no matter whether the insured could actually have been held liable. For example, in this case CMS (unlike Universal) broadly promised to indemnify Martin County Coal for "*all* liabilities, demands, losses, claims, and damages of *any* kind"—presumably obligating CMS to pay for Martin County Coal's settlements no matter the merits of the claims against it. R. 163, Attach. 2 at 1 (emphasis added). But Martin County Coal does not claim either of these theories as a basis for holding Universal accountable for the settlement in this case. What, then, is the basis for claiming that it must pay for CMS's settlement?

There isn't one. Martin County Coal would likely argue that Universal actually does have a contractual duty to pay, notwithstanding the policy's limitation of coverage to cases in which CMS is "actually liable." This is not, Martin County Coal believes, a case about Universal's contractual "duty to indemnify" CMS—a duty that is limited to the coverage terms of the policy. Rather, this is a case about Universal's contractual "duty to defend" CMS—a much broader duty that arises if the coverage terms of the policy could "possibly" have required Universal to pay an indemnity. *See Ayers*, 269 F. Supp. 2d. at 914; *see also Vance*, 730 S.W.2d at 522-23 (holding that the duty to defend is separate from the duty to indemnify). Universal breached that contractual duty. And the damages for breaching the

broader duty to defend include "all damages naturally flowing from the breach." *Eskridge v. Educator & Executive Ins., Inc.*, 677 S.W.2d 887, 889 (Ky. 1984). Surely, Martin County Coal continues, that must include the settlement amount—no matter what the terms of the contract say—so long as it is "prudent" and not "collusive." *See S. Ry. News Co. v. Fid. & Cas. Co. of New York*, 83 S.W. 620, 622 (Ky. 1904) (holding that settlement must be prudent); *O'Bannon v. Aetna Cas. & Sur. Co.*, 678 S.W.2d 390, 393 (Ky. 1984) (holding that collusive judgment not enforceable against insurer). Otherwise, Martin County Coal concludes, Universal gets off largely scot-free for breaching its contractual duty to defend Martin County Coal, impermissibly "profit[ing] by its own wrong." *See Eskridge*, 677 S.W.2d at 889-90 (Ky. 1984) (quoting *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 202 (Cal. 1958)).

But while Martin County Coal is right that this is a case about Universal's breach of its duty to defend, and while it is also right that the cost of the settlement may count towards the damages for that breach, it is wrong that Universal must pay for the settlement no matter what the policy says. *See Vance*, 730 S.W.2d at 523 (holding that damages for breach of duty to defend potentially include liability for judgment). Not only is this theory irreconcilable with *Barnes*—where the insurer also refused to defend, 208 S.W.2d at 314—but Kentucky's Supreme Court has more recently held that an insurer who fails to defend can be held "liable for the [resulting judgment] at a later time" only if "it is judicially determined that the *policy did in fact provide coverage in the circumstances*." *Vance*, 730 S.W.2d at 552 (emphasis added). In fact, the court later emphasized that an insurer's decision to deny "the duty to defend" will not "cause an estoppel" of its ability to dispute that the policy actually covers the insured's loss. *Id.* at 524.

7

Ultimately, Martin County Coal's argument that Universal should not be allowed to dispute CMS's actual liability turns on a misreading of *Eskridge*. The *Eskridge* court did hold that an insurer that breaches its duty to defend must pay all damages naturally flowing from the breach so as to avoid allowing it to "profit by its own wrong"—including, in that case, the settlement amount. *Eskridge*, 677 S.W.2d at 889-90. (Though, in that case the insurer was also paying damages for acting in bad faith. *Id.*) But the court did not mean that an insurer that breaches its duty to defend—a duty, remember, that arises so long as an insured's liability is *potentially* covered by the policy—must automatically pay for a settlement even if the insurer can ultimately show that the insured's liability was not *actually* covered by the policy. In fact, the insurance agreement in *Eskridge* actually did cover the insured's liability. *Id.* And Kentucky's Supreme Court later clarified *Eskridge* in *Vance*, stating explicitly that an insurer that does not defend its insured can later dispute that the policy *actually* covers the insured's liability. 730 S.W.2d at 523.

What's more, it would make little sense to say that an insurer in Universal's shoes is "profiting by its own wrong"—profiting from its decision not to defend CMS—if it avoids paying the settlement. If Universal is right that CMS was not actually liable, then if it had chosen to defend CMS and taken the case to trial, it would have avoided paying any judgment on CMS's behalf.

It is true that this Court has previously expressed skepticism that Universal can re-litigate CMS's actual liability at this late stage. First, in a January 2010 decision holding that Universal breached its duty to defend CMS, the Court rejected Universal's argument that the CMS-Martin-County-Coal agreement could not create a duty to defend CMS on the theory that the policy applied only to CMS's liabilities under *enforceable* contracts. *Martin Cnty.*

8

*Coal Corp. v. Universal Underwriters Ins. Servs., Inc.*, No. 08-93, 2010 WL 55926, at *5 (E.D. Ky. Jan. 4, 2010). The court held, while using admittedly imprecise language, that the purported non-enforceability of the CMS-Martin-County-Coal agreement did not matter for purposes of that decision. *Id.* But the issue before the Court at that stage was only whether Universal had a duty to defend CMS, which turns on whether Universal "potentially, possibly or might" have to cover CMS's liability. And so there was no reason then, unlike now, to ask whether the CMS-Martin-County-Coal contract was "actually" enforceable against CMS.

Second, the Court more recently struggled with the Sixth Circuit's holding that Kentucky law requires insureds to show that they "*could* have been held liable" to recover for settlements from insurers. *Martin Cnty. Coal v. Universal Underwriters Ins. Servs., Inc.*, No. 08-93, 2010 WL 4683808, at *1 (E.D. Ky. Nov. 12, 2010) (citing *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 270 (6th Cir. 2010)) (emphasis added). Did *Travelers* mean that insurers hoping to avoid paying for settlements could always dispute that their insureds actually "would" have been held liable? Or did it mean that insurers hoping to avoid paying for settlements could only dispute whether their insured plausibly "could" have been held liable? Even more puzzling, could insurers *always* dispute whether their insureds "would" or "could" have been liable, even where they did not contractually limit their duty to pay settlements in those limited circumstances? The *Travelers* court did cite to *Kentucky School Boards Insurance Trust v. State Farm Mutual Insurance* for support, which held that "actual" liability was required and made no mention of the requirements of the insurance contract. *Travelers Prop. Cas. Co.* 598 F.3d at 269 (citing *Ky. Sch. Bd. Ins. Trust v. State Farm Mut. Ins.*, 907 F. Supp. 1036, 1038 (E.D. Ky.

9

1995)). But all of this is now moot. As explained above, the Court now realizes that the policy here *does* make coverage contingent on CMS's actual liability, and so *Barnes* and *Royal Indemnity* make clear that it is appropriate to require an "actual liability" showing in this particular case.[2] (As a result, the Court need not decide whether settling insureds like CMS must *always* show "actual liability," no matter the terms of the policy.) So Universal can avoid paying the settlement if CMS was not actually liable under the CMS-Martin-County-Coal indemnity agreement.

## II. The CMS-Martin-County-Coal agreement violated public policy

Universal wins. CMS was not actually liable under its contract with Martin County Coal because the contract violated public policy and was therefore void. Agreements, such as the CMS-Martin-County-Coal agreement, are unenforceable insofar as they insulate parties from liability for breaching duties they owe under public-safety statutes, at least so long (arguably) as the agreement was also struck between parties with unequal bargaining power. *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 651 (Ky. 2007); *see also Hargis v. Baize*, 168 S.W.3d 36, 47 (Ky. 2005). This is so even if the agreement does not specifically purport to indemnify a party against a public-safety duty. *Hargis*, 168 S.W.3d at 46-47. In this case, Martin County Coal sought to enforce its indemnity agreement against CMS precisely to avoid damages resulting from Martin County

---

[2] Martin County Coal argues that the Court should not apply *Travelers*'s "actual liability" standard here because the insurance company there was not being asked to pay for a settlement as damages for breach of its duty to defend. This may be right, as the insurance company there decided to defend its insured after initially breaching, and the *Travelers* court dealt with damages flowing from the initial breach of the duty to defend in a section of the opinion separate from the discussion about the insurer's obligation to pay for the settlement. *See* 598 F.3d at 272. But this does not matter. As explained above, the text of Universal's policy required actual liability. So the source of the actual-liability standard in *this* case is *Barnes* and *Royal Indemnity*, not necessarily *Travelers*.

Coal's violation of a public-safety regulation. *See Hargis*, 168 S.W.3d at 39-40, 47-48 (holding that a public-safety regulation counts as a public-safety statute (citing *Warren City Lines, Inc. v. United Ref. Co.*, 287 A.2d 149, 151 (Pa. Super. 1971)))). That is, it sought indemnity for Phillip Crum's boulder injury, which resulted from Martin County Coal's failure to secure "loose consolidated rock . . . above the roadway" on which Phillip Crum traveled. R. 163, Attach. 9. In turn, this failure was a breach of Martin County Coal's duty under 30 C.F.R. § 77.1001 to "strip" "loose hazardous material . . . a safe distance from the top of pit or highwalls" and to otherwise secure "loose unconsolidated material"—a duty specifically targeted at entities like Martin County Coal. *See Dones v. Super Serv., Inc.*, No. 2005-CA-001696-MR, 2006 WL 2382743, at *7 (Ky. Ct. App. 2006) (holding that public-safety statute must impose duty targeted at would-be indemnitee).

True, as Martin County Coal says, the Court previously declined to grant summary judgment on Universal's claim that the contract was unenforceable for this reason. In its last decision, the Court held that while the contract may be invalid insofar as it purported to exculpate Martin County Coal for failing its § 77.1001 duty to clear loose material, it was unclear that Martin County Coal's failing to clear loose material was the undisputed cause of Phillip Crum's injuries. Perhaps, as Universal previously failed to dispute, Martin County Coal's breaches of *other* duties were the true causes of Phillip Crum's injuries. And presumably the broad CMS-Martin-County-Coal indemnity agreement could still exculpate Martin County Coal from liability for breaches of those other duties, this Court explained.

But, as is now clear, the unrebutted evidence shows that it truly was the § 77.1001 duty, and only the § 77.1001 duty, that Martin County Coal sought to escape under the contract. The post-incident investigation revealed that loose rock above the roadway, in

violation of § 77.1001, caused the incident. R. 163, Attach. 9; *see also id.*, Attach. 6 at 10. In contrast, there is no evidence to indicate that Martin County Coal's employee's alleged breach of the duty to drive carefully caused the injury. The driver of the car said that he had "no warning before the accident," *id.*, Attach. 6 at 7, because he did not see the boulder before it hit the car, *id.*, Attach. 18 at 4. Martin County Coal does not dispute this. And to the extent Phillip Crum's and CMS's other causes of action—gross negligence, and failure to inspect—allege breaches of duties truly different from the duty to secure loose material—a dubious proposition—Universal notes that none enjoy any support from record evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). Martin County Coal has pointed to no evidence to the contrary, and it is not this Court's job to comb the record for it. *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992).

The conclusion that the CMS-Martin-County-Coal indemnity agreement violated public policy is all the stronger because CMS and Martin County Coal did not stand on equal footing. As the Kentucky Supreme Court held in *Cumberland*, "most cases"—it is unclear from the opinion whether this meant "all cases"—in which courts have held that contracts are unenforceable for shifting public-safety-statute duties also involved a disparity in bargaining power. 238 S.W.3d at 651 ("Furthermore, no significant disparity in bargaining power existed between the contracting parties in the instant case, unlike most cases in which exculpatory clauses were deemed invalid due to safety violations or other public policy concerns."). For starters, CMS, a small business with a handful of employees, was financially inferior to Martin County Coal, a company worth millions. *See* R. 162 at 2. In

fact, CMS was apparently on the verge of going out of business. R. 163, Attach. 16 (noting that CMS is "inactive" and its last annual report was in 2003). But more importantly, the CMS-Martin-County-Coal agreement was fearfully close to a contract of adhesion. *Mullins v. N. Ky. Inspections, Inc.*, No. 2009-000067, 2010 WL 3447630, at *3 (Ky. Ct. App. Sept. 3, 2010) (holding that contract that undermined public-safety policy also involved disparity in bargaining power because it was a contract of adhesion). It was non-negotiable: Like all of Martin County Coal's vendors, CMS had to sign the contract to get Martin County Coal's business, on Martin County Coal's terms. *See id.* (noting that contract was offered on a "take-it-or-leave-it" basis); *Shafer Plaza VI Ltd. v. Lang*, No. 2007-CA-001391-MR, 2008 WL 4754877, at *2 (Ky. Ct. App. Oct. 31, 2008) (same); *see also Cumberland*, 238 S.W.3d at 654 (finding disparity in earlier case partly because one party was "required to sign the release at issue" before he could do work for the other). And the agreement was one-sided, allowing Martin County Coal to terminate CMS's access to the property—and thus presumably the entire deal—"at any time," R. 163 at 2, and exposing CMS to a breathtakingly broad duty to indemnify Martin County Coal. *See Speedway Superamerica, LLC v. Erwin*, 250 S.W.3d 339, 342 (Ky. Ct. App. 2008) (finding disparity in bargaining power partly because one party saw little benefit from contract that authorized the other party to cancel the agreement "at any time, for any reason").

All of this points to a disparity far more than adequate to support not enforcing the CMS-Martin-County-Coal agreement. Where, as here, a contract already has the vice of insulating a party from a duty imposed by a public-safety statute, a disparity far smaller than the one in this case will suffice. In *Hargis*, for instance—where the disparity was later deemed important to voiding a contract that exculpated a party from a public-safety-statute

duty, *Cumberland*, 238 S.W.3d at 653—the inequality was far smaller. The contracting parties were the sole proprietor of a lumber yard and sawmill and an independent contractor hired to haul logs. *Hargis*, 168 S.W.3d at 39. There was a disparity in bargaining power in that case merely because (1) the truck driver was just one man while the defendant owned several sawmills and (2) the truck driver "[p]resumably" had to "sign the release at issue before he could deliver logs." *Cumberland*, 238 S.W.3d at 653. Similarly, in *Mullins v. Northern Kentucky Inspections*, the court found that a contract that violated public-safety policy, 2010 WL 3447630, at *4, also resulted from a deal between unequal parties, *id.* at *3. The parties were an individual homebuyer and a company he hired for $200 to conduct a home inspection. *Id.* at *1. To support its disparity finding, the court noted only that the parties did not negotiate the pre-printed form contract, presented on a take-it-or-leave-it basis, and that the home inspection company knew more about home inspection than the home buyer. *Id.* at *3. The long list of evidence indicating a disparity in this case is much more substantial.

Martin County Coal might object that Kentucky courts have not expressly said that the standard for finding a disparity in bargaining power is relaxed where the contract also violates public-safety policy. This argument would not change the Court's decision for several reasons. First, it is unclear whether a disparity in bargaining power is even a truly necessary showing where the contract also purports to circumvent a public-safety statute. The *Cumberland* court was unclear on this point, saying that, in "most cases" where a contract has been held void for shifting public-safety duties, there was also a disparity. Second, this Court does not know how else to read *Hargis* and *Mullins*, where the evidence to suggest a disparity was not exactly overwhelming, except as saying that the standard is

reduced. What's more, it would certainly make sense to employ a reduced standard where the contract already violates public-safety policy: If the standard for finding a disparity is the same in cases with and without a violation of public-safety policy, then whether a contract violates public-safety policy is completely irrelevant to deciding whether it is void. Third, even if *Hargis* and *Mullins* do not represent a reduced standard, then they must be illustrations of the ordinary standard for finding a disparity of bargaining power in Kentucky, and the facts supporting a disparity in this case still far exceed the facts in those. Fourth, the litany of evidence demonstrating a disparity in this case is so substantial that the Court would find a disparity even under a more rigorous standard.

It is true that Martin County Coal does not leave these facts *completely* unanswered. There could be no disparity, it says, because Martin County Coal was not a monopoly and because CMS was a small business. So the reader might wonder why a jury should not decide whether there was a disparity in bargaining power. (Again, this assumes the *Cumberland* decision even requires such a showing where the contract also violates public-safety policy.) To begin, Martin County Coal does not dispute any of the individual facts supporting the conclusion that there was a disparity—namely, that it was a larger company, that there were no negotiations, and that the terms of the contract were one-sided. And it appears that the ultimate decision whether these undisputed facts, weighed against Martin County Coal's contrary assertions, comprise a disparity in bargaining power may be a *question of law* for the Court to decide. *See Broughton v. Motorcycle Safety Found., Inc.*, No. 2006-1939, 2007 WL 3317792, at *1, 3 (Ky. Ct. App. Nov. 9, 2007) (evaluating claimed disparity in bargaining power after stating that "only questions of law" remained in the case). Disparity in bargaining power certainly seems to be an issue of law when it is part of a larger

evaluation of whether a contract is unconscionable. *See, e.g.*, *J & E Constr., Inc. v. Bobcat Enters., Inc.*, No. 07-235, 2008 WL 3982683, at *8 (E.D. Ky. Aug. 26, 2008); *U.S. Achievement Acad., LLC v. Pitney Bowes, Inc.*, 458 F. Supp. 2d 389, 400 (E.D. Ky. 2006). And the disparity cases cited above—*Cumberland*, *Mullins*, *Shafer*, and *Speedway*—all conducted their disparity analysis without any hint that a jury should decide that ultimate question.

But even if the disparity in bargaining power is ultimately a question of fact, Universal is still entitled to summary judgment. It pointed to a whole host of evidence supporting the claim that there was a disparity here, and so Universal met its initial burden of showing a disparity. The burden then shifted to Martin County Coal. *Gembus v. MetroHealth Sys.*, 290 F. App'x 842, 844 (6th Cir. 2008) ("Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."). And it yet it pointed to no "specific facts," *id.*, to meet it.

Again, Martin County Coal says first, and unconvincingly, that there can be no disparity in bargaining power here because Martin County Coal was not a monopoly. The first problem with this argument is that while the existence of a "practical monopoly" or a party's unavoidable need for another's business can support finding a disparity, *see Greenwich Ins. Co. v. Louisville & N.R. Co.*, 66 S.W. 411, 412 (Ky. 1902)—and may be especially important where the solitary claimed basis for disparity is financial—it is not the *only* basis for doing so. As described above, courts may also consider the sophistication of the parties, whether a contract was negotiated, and the one-sidedness of its terms to find a disparity. The second problem with this argument—that a contract can only be unenforceable if one party has true monopoly market share—is that it overlooks the

apparently reduced standard for finding a disparity in bargaining power where a contract also improperly shifts public-safety-statute duties. *See Hargis, supra.*

Martin County Coal is also wrong that there can be no disparity in bargaining power because CMS was a small business. The theory is that, because a small business has more than one employee, it must be too sophisticated to suffer a disparity in bargaining power. But it is simply untrue that all small businesses are too sophisticated to permit a disparity in bargaining power. Courts frequently recognize that small businesses can stand on less than equal footing with another contracting party. *See Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344, 358 (Minn. 2003) (quoting *Kloss v. Edward D. Jones & Co.*, 54 P.3d 1, 12-13 (Mont. 2002)); *Sauve v. Winfree*, 985 P.2d 997, 1001 (Alaska 1999); *Amoco Oil Co. v. Dickson*, 389 N.E.2d 406, 409 n.5 (Mass. 1979). And so Martin County Coal must have done more than simply point to CMS's small-business status to meet its burden. Maybe it could have pointed to *actual* evidence, rather than lodge conclusory assertions, R. 165 at 15-17, that CMS had the opportunity to take its business elsewhere. *See*, *e.g.*, *Broughton*, 2007 WL 3317792, at *3. Maybe it could have pointed to evidence that CMS actually was sophisticated—perhaps testimony that it had experience with these kinds of deals or that it had a lawyer on retainer. And maybe it could have explained why the lack of negotiations leading to this indemnity agreement, and the apparent one-sidedness of the agreement, were not signals of a disparity. Instead, it offered a conclusory assertion about the nature of small businesses generally, not specifically tailored to the facts of this case. *See Gembus*, 290 F. App'x at 844 ("Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth *specific facts* showing a triable issue of material fact.") (emphasis added). This argument—that CMS was a small business, and that small

17

businesses have been found in some cases to be too sophisticated to suffer a disparity—would be little different from arguing that simply because some cases have held that an individual person did not suffer a disparity in bargaining power vis-à-vis a company, an individual person could never suffer a disparity. This is obviously not true; whether a disparity exists hinges on the facts of each case. And having failed to tailor its argument to the facts of this case, Martin County Coal has not met its burden. The contract was void as a matter of law.

## III. Damages

Finally, no material issues of fact remain about the damages available to Martin County Coal, or the lack thereof. As explained already, Martin County Coal cannot recover the settlement amount because CMS was not actually liable for it. Beyond this, litigation costs are also unavailable now. Recall that Martin County Coal is in this case as a mere assignee of CMS's breach-of-duty-to-defend claim against Universal. So Martin County Coal's recovery of litigation costs has always been limited to CMS's defense costs in the original Martin-County-Coal-CMS-Crum litigation. *See Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 838, 842 (Ky. 2005) (holding, where insurer refused to defend and filed declaratory judgment action to establish no coverage liability, insureds were entitled to recompense for cost of defending underlying suit but not recompense for litigating declaratory judgment action); *see also* 1 Allan D. Windt, *Insurance and Disputes* § 4:35 (5th ed. 2010). Yet Universal notes that "[Martin County Coal] has no evidence to prove that CMS spent any amount defending against [Martin County Coal's] counterclaim." R. 168 at 16. Martin County Coal failed to respond to this point, and so Universal is entitled to summary judgment on it too. *Celotex Corp.*, 477 U.S. at 325 ("[T]he burden on the moving

party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

## CONCLUSION

Accordingly, it is **ORDERED** that Universal's motion for summary judgment, R. 163, is **GRANTED**, Martin County Coal's motion for summary judgment, R. 165, is **DENIED**. This case is **DISMISSED** and **STRICKEN** from the Court's active docket. A separate judgment shall issue.

This the 1st day of June, 2011.

Signed By:
*Amul R. Thapar* AT
United States District Judge